Case number 23-7174. Hulley Enterprises Ltd. v. Russian Federation. Mr. Reisenberg for the affidavit. Mr. Shepherd for the evidence. Good morning, counsel. Mr. Reisenberg, please proceed when you're ready. Good morning, your honors, and may it please the court. Russia has reserved three minutes for rebuttal. Your honors, the district court here made three errors of law. First, the district court found that the litigants here supposedly agreed to exclude and forfeit judicial review of questions that arise under the Foreign Sovereign Immunities Act at Section 1605A6, including whether Russia made an arbitration agreement with or for the benefit of petitioners under the Energy Charter Treaty, or ECT. This was wrong. No exclusive delegation agreement can be shown here under the clear and unmistakable standard, or indeed under any standard, looking at the text and the context and the international law and international practice regarding the competence-competence doctrine. Most obviously, Hulley Enterprise and the other appellees in this case never made this exclusive delegation argument in any of the other six courts where this case has been heard across Europe, Asia, and North America for 10 years. And in any event, the jurisdictional elements under the Foreign Sovereign Immunities Act cannot be delegated exclusively to external arbitrators. The FSIA exceptions implicate not only the subject matter jurisdiction of a court of the United States, but also the foreign relations of the United States, and potentially the reciprocal treatment of the United States in foreign jurisdictions. So naturally, only the courts of the United States can decide those questions and not external arbitrators. What about the Dutch courts? So if the principle that the district court relied on were correct, then would that have also been true of judicial review in the Dutch system? If the principle that the district court in this case relied upon was correct. In other words, if the deciding criteria here is that the tribunal, the arbitral tribunal, determined whether it had jurisdiction, and then that's dispositive for purposes of the U.S. inquiry into it, would that also apply to the Dutch court review that happened in the aftermath of the tribunal determination? Chief Judge Srinivasan, you're asking me if the lower court's premise was correct. We would say that I can't accept that premise because the government of the United States has disagreed with that premise in the amicus brief filed in NextEra versus the Kingdom of Spain. I guess here's one way to ask it. Yes, Judge. So the arguments have been made here by the other side, and the district judge accepted the argument that you shouldn't look at this issue anew because the tribunal already resolved it. All the parties agreed that the tribunal was going to resolve this, and so there's no court second guessing of that. I guess my question is, if that were true, would that also have been true in an argument that could have been made to the Dutch courts? So, Judge, what we would say is I want to address all these different possibilities, and apologies if I'm struggling to decide what's an assumption and what's not an assumption here. So maybe I'm not asking the question correctly, but you started with the point that the argument that prevailed below and that was asserted by the has not been accepted in any of the other countries in which the award is sought to be enforced. I guess my only question is, could you make that same point about review in the Dutch system, that if that argument were true and it would have been accepted by any of the other countries, it also would have been accepted within the Dutch system itself because you could equally say, look, everybody agreed that this was supposed to be resolved by the tribunal, so why are you the U.S. court looking at it, which is the same question as why are you the court in some other country looking at it? You could also have made the same argument and it also would have equally been a prevailing one in the Dutch system, were it in fact a meritorious argument. Well, I'll go through the foreign courts and we can talk about what each of them would have said with respect to the exclusive delegation concepts and also the issue preclusion concept, which is... Yeah, I'm not talking about issue preclusion, I'm just talking about the ground that was actually admitted in the decision below. The decision below rested on the idea that the parties here clearly and unmistakably delegated arbitrability to the arbitrators, including those arbitrability concepts that have been codified as jurisdictional elements under the Foreign Sovereign Immunities Act. That argument was never made and would have lost. That argument would have been rejected in the Netherlands and Belgium and France and Germany and India and England and Canada. All of the other jurisdictions that have heard this case would have looked at this clause and they would have said this is a competence-competence clause. I guess what I'm asking is, I know that you disagree with whether the argument is a successful one, but I'm just asking you to accept the premise. Let's just assume that the argument is a successful one. Would it be equally successful in the Netherlands too? In other words, why did the Dutch... I mean, you can look at this as a friendly question. Why would the Dutch courts have even looked at the question in the way that they did if it were true that the parties had given this to the arbitrator to determine? Wouldn't it have been equally preclusive in the Dutch system too? It would have. Well, it would have... You said it wasn't made in any of the other countries. That's right, Chief Judge. Was it made on judicial review in the Dutch system? This argument wasn't made and I honestly, I don't know the answer, Chief Judge, if it could have been made because the clause in the Unsettraal Rules is not unfamiliar in the Netherlands. It's also found in Dutch statutory law. It doesn't add anything to Dutch statutory law and it also doesn't add anything to any other statutory law where the Unsettraal Rules are accompanied by the enactment of the Unsettraal Model Law like Russia. Adopting the Unsettraal Clause, the Competence Clause here, wasn't intended to change anything that you don't normally get as a statutory background presumption in Russia or Cyprus or the Netherlands. Arbitrators decide their competence first. Courts should not interfere with the analysis of competence during the arbitration, but all of those same jurisdictions also contemplate post-arbitration judicial review of the same question. It is fundamentally dissimilar, even though... Judge Rao. I guess I'm not sure why you focus so much on competence, competence, which is kind of a international law, international arbitration concept, and instead not focused on the Foreign Sovereign Immunities Act and the role of the district court to decide jurisdictional facts. So it seems these other principles are, of course, out there, but we have a specific statute in the United States to determine the scope of sovereign immunity and why isn't that focus? Judge Rao. Start there. We would be delighted to prevail on either of these two grounds, Judge Rao. There are going to be more arbitrability arguments in this case. After the jurisdictional questions are decided, there still will be more questions of arbitrability arising under Article 5.1c of the New York Convention. And as explained in Chevron versus Ecuador, it is only at that on the arbitrability phase of the case that an exclusive delegation agreement would matter, would bite. And we will, if we have to, if we win on jurisdiction, then it won't matter, Judge Rao. And so we do want to focus today on the fact that two of our arbitrability arguments overlap with FSIA arguments. But nonetheless, the conclusion by the district court that this was an exclusive delegation agreement, that nonetheless is going to have consequences down the road in this case when we begin to litigate issues of whether there was any investment under Article 5.1c of the New York Convention. Having an exclusive delegation agreement in place as part of the law of the case would be wrong, and it would undermine the long-term way in which this case is going to be litigated. So we don't, I mean, there are different combinations of how these different... That explains why you're focused on that question. But not exclusively. Jurisdictional questions can't be delegated. On this question of delegation, so suppose the parties, in fashioning their agreement to go to arbitration, forecast all of what's happened and the competence-competence notion were front and center. And suppose they just said, we understand that this might be construed as a competence-competence situation such that a court could actually second-guess what the tribunal did. But we mean for it to be more robust than that. We actually mean for this to be reclusive. I take it the parties could do that. And if they did, that would be binding courts. Many courts would respect that type of agreement. The parties have not actually discussed whether the Dutch courts would ever have honored such agreement, but obviously under first options versus Kaplan, at least in the non-jurisdictional context, if we weren't talking about sovereign immunity, obviously the United States recognizes something called an agreement to arbitrate arbitrability, brackets exclusively. The ideal example of this type of clause is found in the Rent-a-Center case. That's a United States Supreme Court case, which this court is very familiar with. That court, the Rent-a-Center court reviewed an arbitration clause, which said that the arbitrators will decide these questions exclusively and not any national courts, state or federal or local. That was a very clear clause. Now, this text that we're looking at today doesn't include the word exclusively. It doesn't include the word arbitration. So, suppose that had happened. Suppose you had an agreement where all the I's are dotted and the T's are crossed, and actually, for whatever reason, both parties actually agree that they want that to happen and they codify it in that way. What implications would that have in an FSIA jurisdictional inquiry here? The United States government would answer this question as follows, Chief Judge Srinivasan. These questions still cannot be delegated to arbitrators. This was stated in the amicus brief filed in Nexterra v. The Kingdom of Spain, which we submitted with our first 28-J letter. The practice of this court has not explicitly confirmed that point, but it has certainly borne it out in Chevron v. Ecuador and in Stilex v. Moldova and in Nexterra v. The Kingdom of Spain. This court has consistently heard cases where no parties argued whether the agreement was an exclusive delegation agreement or not. In those cases, it was generally accepted by everyone participating in those cases that these were agreements to arbitrate arbitrability, and this court never once, in any of those three cases, relied on the exclusive delegation agreement as part of the sovereign immunity analysis. That confirms the point that the in their amicus brief. So whether we look at the FSIA aspect of this question, or we look at the UNSATRAL aspect of this question, it is evident that the lower court erred by failing to decide these questions independently and de novo. Mr. Eisenhower, assume for a moment that I agree with you that the district court did have a responsibility to determine those questions de novo. What do we make about issue preclusion from the Dutch decision, right? How do we think about the principles of comedy and reciprocity that apply to foreign decisions? Judge Rao, I want to start by quoting the Second Circuit. So I guess maybe my question is, you know, even if the district court has a de novo obligation, how should the district court then think about the issue preclusion? Judge Rao, your brothers and sisters on the Second Circuit said, whether a party has consented to arbitrate is an issue to be decided by the court in which enforcement of an award is sought. And that means the courts of the United States. And on that, on the basis of that principle, the Second Circuit declined to give issue preclusive effect to the courts in Egypt. And in the VRG case, which has a reported decision and an unreported decision, Judge Calabrese and Judge Cabranes both declined to give preclusive effect to the courts of Brazil in cases that reject annulment. Now, here we have a situation where the annulment litigation is ongoing. The Dutch courts have not yet rejected annulment on all grounds. We still have a case pending before the Dutch Supreme Court right now. And the Dutch Supreme Court has previously reversed decisions of the intermediate Dutch appellate courts. Do you know, has the United States government taken a position on whether issue preclusion would apply in this kind of context? Do you know? We have not. We have not. The issue was not raised in, well, the issue was not raised in the amicus brief by the United States in Nexterra versus the Kingdom of Spain. But the decision in Nexterra versus the Kingdom of Spain is full of discussion of what the EU courts would hold, what the Swiss court had held, and what the arbitrators had decided. And the panel in Nexterra versus the Kingdom of Spain never suggested that there should be any deference to the arbitrators or to the EU Court of Justice or to the Supreme Court of Switzerland with respect to the subject matter jurisdiction of a United States court. Now, we have to ask ourselves, why does this situation exist? Why did the Second Circuit hold as it did that each court must analyze these questions independently and de novo? And the answer, well, first of all, in the sovereign immunity context is because of the implications for the United States. It is not only the U.S. executive branch that has stated that courts need to decide these questions without deference to arbitrators, the logic of which would also say United States courts should not defer to foreign courts. Those are two separate things. Well, we have, I mean, since the time of the founding, I mean, we have cases recognizing principles of comedy between U.S. courts and foreign courts. That's entirely correct, Judge Rao. The Foreign Sovereign Immunities Act, however, contains an exception to foreign sovereign immunity for arbitration awards, but no such exception for the enforcement of foreign court judgments. I would say that that is a sign that the United States Congress does not necessarily believe that foreign courts are so responsible and trustworthy that the foreign relations of the United States should be delegated to foreign courts either. But I don't see an argument in your briefs that the elements of issue preclusion aren't met here. Some of the elements of issue preclusion are met here, but the Dutch, one of the most important elements of issue preclusion is whether the court that has issued the judgment, the preclusive effect of which we are debating, itself would consider itself to be preclusive. I'm obviously stating that factor incorrectly, but they concede that the Dutch law on this question is important. And the Dutch law on this question is as follows. Decisions denying annulment by a Dutch court are not intended to have preclusive effect because the Dutch courts follow the majority rule around the world that only decisions that grant annulment at the seat of arbitration have potentially preclusive effect. That's confirmed in the text of Article 5.1.e of the New York Convention. The New York Convention expresses this single instance where a foreign court judgment is given preclusive effect and implicitly excludes all the other potential ways of approaching issue preclusive effect. So it sounds like you're, I'm sorry, it sounds like you're, I mean, no one's decided issue preclusion here yet, and so we're kind of operating in a little bit of a vacuum, but it sounds like one possibility is issue preclusion actually can govern when you're looking at giving enforcement to an arbitration assessment abroad as a general matter, but not when one of the parties, when the party who would be affected by it as a foreign sovereign, because then foreign sovereign, the Foreign Sovereign Immunities Act kicks in. So even if issue preclusion otherwise it wouldn't govern in this context. Is that part of your submission? Chief Judge Srinivasan, we would say that the immunity situation is unique. In 2016, all the parties agreed, and Judge Howell confirmed in her first memorandum opinion in this case, the 2016 memorandum opinion, that the parties didn't dispute. The Dutch court's decision was not going to affect the sovereign immunity question at all. It was on that basis that, at the time, Russia was saying, we should just go forward. We won't even get into Article 5.1E of the New York Convention. Let's just litigate the immunity question. That's what we said in 2016, and at that time, Holly agreed with us. The Dutch courts can't decide the United States courts subject matter jurisdiction anyway. A separate question is whether or not a foreign court judgment can affect questions under the New York Convention. And it is there, as I was discussing with Judge Wilkins, it is there that we have an inherently asymmetrical system by virtue of the text of the New York Convention. And the point of this, in addition to the huge stack of foreign in addition to all those foreign authorities, there is a policy. The New York Convention drafters and signatories wanted to keep the focus on the arbitration. They were replacing an even older system, which was called double exequatur. And what that meant was that the judicial stamp of approval would be mandatory. When the arbitration was done, the parties would rush to get a judicial stamp of approval or disapproval. And that entire system was thrown away in 1958, when the New York Convention was put into place. Chief Judge Sreenivasan, you pointed out that we're getting way, way off track. The district court didn't decide that. I don't know if I said that we're getting way off track. I'm just saying that we don't have a determination by the district court on issue preclusion. Forgive my over caffeinated characterization of what you actually said, Chief Judge Sreenivasan. The district court here has not decided this enormously complicated question. Can I ask you a question? You said that the FSIA includes an arbitration exception, but not an exception for comedy to foreign judgments. So I'm wondering actually how we should think about that. I mean, even if we remanded to the district court for consideration of this issue. I mean, as a legal matter, it's possible either the FSIA didn't include that exception, so it doesn't exist, or the FSIA left in place the ordinary principles of comedy that courts determine under the Hilton case and those factors. And so maybe in some instances we give comedy to a court for certain jurisdictional type facts, even in a de novo determination, or maybe it means they can't be considered at all. But I'm wondering how we should think about the FSIA exceptions, because I think that was an interesting point that you that you raised. Judge Rao, comedy is yet another equally complicated way of looking at this question. Here, the Dutch question goes to issue preclusion. I mean, I guess when I say comedy, I mean about comedy about issue preclusion, you know. In either event, Judge Rao, we would need to, on remand, take a step back and acknowledge we're talking about a Dutch court's interpretation of Russian law, primarily. There is no final word from the Dutch judicial system as to what the Energy Charter Treaty itself means, because in paragraph 5.2.10, the Dutch Supreme Court cast doubt on how the Court of Appeal of The Hague had interpreted Article 45.1 of the Energy Charter Treaty. And what that means is that with respect to the questions of treaty interpretation, the only issues in this case that could even arguably be characterized as questions of Dutch law, although of course the Energy Charter Treaty is not just Dutch law, it's also French law and EU law, there are a lot of other states with an interest in how the Energy Charter Treaty is interpreted, not just the Dutch, not just the Netherlands. If we recognize that all four instances in this case have disagreed about how the treaty is interpreted, the tribunal was overruled by the first instance court, which was overruled by the second instance courts, which was doubt was cast by the Supreme Court. All that is left is the Russian law questions, which need to be under the text of Article 45.1 of the Energy Charter Treaty. A Dutch court is not the authoritative interpreter of Russian law. So how is that supposed to work, this provisional application of the treaty? Only a Russian court decides whether a provisional application is consistent with Russian law? No, Judge. Judge Wilkins, a tribunal can decide the question by looking at Russian law. A foreign court can decide the question by looking at Russian law. And here, one of the elements of Judge Howell's decision that we challenge here is that Judge Howell declined to look to any Russian legal sources. Judge Howell declined to decide the treaty, declined to interpret Article 45.1 of the Energy Charter Treaty. Judge Howell said that the U.S. court was bound by the decision of the tribunal, even though all the Dutch courts had already rejected the reasoning of the tribunal. And when it came to decide the Russian law question, Judge Howell looked only at American case law, American case law specifically talking about what the word commerce might mean, what a commercial dispute might be. And the American legal system's history with the word commerce is very unique, and it is certainly not the way Russian courts have decided a completely separate question. And the relevant question here is whether disputes under the Energy Charter Treaty, any disputes arising under Article 26, would be characterized under Russian law as public law or private law. So let's suppose if we were to remand to have the district court do that analysis, wouldn't we review that de novo? When the lower court evaluates the Russian law questions and the treaty law questions, your review would then be de novo. So why send it back? Why shouldn't, if you're right, then why shouldn't we just figure out what Russian law? Judge Wilkins, you have that discretion. You have the discretion to decide alternative grounds for upholding a lower court's decision. However, the very, very usual practice is to remand such questions alternative grounds unless they are straightforward questions of federal law. This is a complex case involving treaty interpretation and foreign law, and we have not found any instance where this court has decided a question of foreign law that was left undecided at first instance. And we list, I think it's the Eshel versus the Commissioner case by the D.C. Circuit, and there's a long line of other precedents included in the gray brief, our reply brief, and our proposed surreply from, I believe that was August. I just don't understand why it makes sense to run the railroad that way. Send something back down, and then we're going to review it de novo anyway. The kind of thing that drives district judges crazy, and I'm a former district judge. No. Understood, Judge Wilkins. The way that it has been justified in the past is the allocation of judicial resources, that foreign law can be complex. Expert opinions need to be evaluated. District court judges may want to hear from experts on Russian law, evaluate their credibility, compare the credentials. But we already have that in the record. Well, there hasn't been a cross-examination of these experts. We did propose an evidentiary hearing under Judge Howell's standing order. We sent the appropriate email to chambers, copying Petitioner's counsel, copying Hulley's counsel, asking for an evidentiary hearing. The scope of such an evidentiary hearing was never really hammered out because we never proceeded to that stage. Judge Howell concluded that it was moot whether our Russian law expert opinion would be docketed or not. In one of the footnotes to her judgment, Judge Howell said she would not look at the Russian case law. So as Chief Judge Trinovason said, we would be starting out looking at the Russian law issues now, for the first time, in the first instance here. Now, they'll say, of course, there's a beautiful record already established in the Netherlands. But as I pointed out, these instances of the arbitration and the courts in the Netherlands have not agreed on these questions. They've disagreed every single time. So it's very dissimilar to the Chevron versus Ecuador case, which I hope will be 99 percent of the cases that appear before you, where the tribunal was upheld on every ground by all three layers of the Dutch court. In Chevron versus Ecuador, there was total harmony coming from the Netherlands as to how that bilateral investment treaty between Ecuador and the United States government should be interpreted. Here, you would be forging ahead in your discretion into a complete swamp of disputing experts, disputing tribunals, and disputing Dutch courts going back 20 years. Mr. Merck, are you aware of any cases where the Supreme Court or a circuit court has grappled with how a court should think about comedy to a foreign sovereign versus comedy to a foreign court? So here, arguably, there are two different competing issues of that sort. We have Russia, on the one hand, as a party in this case, and we have the Dutch courts. Judge Rao, this begins to sound like animal science products versus Hebei Wellcome Pharmacy or pharmaceutical company. This is a 2018 decision by the Supreme Court. In that animal science products case, the Supreme Court basically reaffirmed that when we look at foreign law, we contemplate a system very similar to the American legal system. You give respectful deference to what foreign executive authorities might say, but you allow foreign courts to say definitively, as a matter of binding precedent, even if the foreign court doesn't believe in precedent, foreign courts decide foreign law. And this isn't just the 2018 decision. This goes back 200 years to Chief Justice Marshall, and I believe I'm going to Elmendorf versus Taylor, where he said an English court decides English law, a French court decides French law, and a Kentucky court decides Kentucky law. Here, there's no question about the Russian courts deciding the Russian. Really, the options are the district court looks at Russian law, you know, de novo, or perhaps it looks to the Dutch courts. In that instance, Judge Rao, I think it would still be very anomalous to say we defer to Dutch courts on Russian law. And when we talk about the Energy Charter Treaty, we have to remember that the Dutch courts did not agree with the French court. In this case, the French court said that all these questions were ambiguous. And all these questions needed to be referred to the EU Court of Justice. The US isn't a party to the ECT, right? It isn't. We're not even a signatory to that treaty. And this is all the more reason not to play favorites amongst the different members of the European Union, Judge Rao. If the Dutch courts are disagreeing with the French courts, and the EU executive authorities have agreed with the Russian Federation on how the treaty needs to be interpreted, this question still needs to be approached very carefully and meticulously. We can't just rush forward and allow the first court to decide it, to be the last court to decide it. Can I ask one question about the ECT? So you have a series of arguments as to why you think the ECT doesn't prevail here. And if all of those arguments go to scope and not to existence, then even if you think that the district court erred in deferring wholesale to the arbitral tribunal's determination of whether it had jurisdiction, that still wouldn't matter for this stage of the case, because everything would go to scope rather than existence. Am I understanding that right? So in other words, in order for us to remand on the issue, if we agreed with you on the issue that the district court rested its decision on, we'd still need to conclude that at least some of your arguments go to the existence as opposed to the scope. Well, Chief Judge Srinivasan, if all of these arguments go to scope, and we don't agree with that, but if they go to scope, because there was no exclusive delegation here, we still should be allowed to argue these questions under Article 5.1c of the New York Convention. You still have that latitude to do that no matter what. Well, if there's an exclusive delegation agreement that applies not only to the FSIA questions of arbitrability, but to all arbitrability questions. Yeah, I take that point. But suppose that we, I'm just engaging in a hypo where we reject that part of the district court's assessment, and we agree with your competence determination. But then in order for you to still have room to go on jurisdiction, you still have to show that your arguments as to the ECT go not to scope, but to existence. That's right. And a scope question, whatever that might mean, and we may be talking about that next, a scope question, question of the scope of the issues that the parties agreed to arbitrate, is not a jurisdictional question under the Foreign Sovereign Immunities Act, as held in Chevron versus Ecuador. Now, the question of whether these arguments are scope questions or not was not carefully and meticulously explained in the district court's judgment. That's what I was going to say. But the district court did engage. The district court went through them because the district had the first part of the analysis where the court relied on the tribunal's assessment.  And then it went on to address your arguments and rejected them. That's true. Now, we'll look at the two. Forgive me. I've gone way over. So we'll look at the two arguments regarding Energy Charter Treaty interpretation that we've raised in this appeal. The first question under Article 45.1 of the Energy Charter Treaty about whether Russian law allowed Article 26 to come into effect or not. In the red brief in this case, Hulley described that as a validity. According to NextEra versus the Kingdom of Spain, either validity arguments or existence arguments are jurisdictional under the Foreign Sovereign Immunities Act. I would say that even to decide who is right about that, whether we are right that it's an existence argument or Hulley is right that it's a validity argument that requires itself interpretation of the Energy Charter Treaty and Russian law. And for the reasons discussed with Judge Wilkins, this panel may wish to spend the next nine or 10 months focusing on that question alone. Maybe it'll go faster with this court. But that question alone requires remand. It's so complex to decide whether it's an existence question or a validity question that the district court should be given an opportunity to decide that in the first instance. OK, so we'd have to but we'd have to conclude that there's at least a possibility that it's an existence question as opposed to a scope question. Because if there's no possibility, then you can't get home on jurisdiction anyway. Well, if it's a question of validity, then it's still a question of existence, according to NextEra versus and that's how they characterized it in the red brief. They may imminently, based on the last sentence in their final 28J letter, they may very shortly be trying to recharacterize their early argument and say, oh, no, no, not validity. We meant scope. I don't believe they should do that. I don't believe they should be permitted to do that since they so resoundingly said it was a validity argument in the red brief. But the point here is that there are no private law claims that can arise under the Energy Charter Treaty as properly interpreted. So Article 45.1 bringing in Russian law ousts the entirety of Article 26. It's for that reason. It's not a scope question. We're not talking about our case. We're saying any conceivable ECT case. Now, they may recharacterize that and that's why I've reserved three minutes for rebuttal. The final question, and again, we'll stay on NextEra very briefly. NextEra can't be read in conflict with Chevron versus Ecuador. Chevron versus Ecuador said there must be an agreement between the parties. But Chevron didn't mean parties necessarily before the court. Obviously, it was referring to parties to a treaty and then their beneficiaries. Well, precisely, Judge Weklens, you've read my mind. Under the NextEra paradigm, where you forget all this confusing stuff about offers and acceptance, under this paradigm, where you look at the original agreement between the Netherlands and Luxembourg and Spain, even under this paradigm, the question of whether they are third-party beneficiaries is not a question of scope traditionally. Traditionally, that is a question of existence. That is the question that was being litigated in First Options versus Kaplan. Nobody disputed in First Options versus Kaplan before the Supreme Court. The corporate entities, First Options of Chicago and MK Investment, had an arbitration agreement. And the question of whether Mr. Kaplan and Mrs. Kaplan had rights under that agreement was a question or obligations to arbitrate. That was analyzed as a question of whether those rights and obligations exist. You can linguistically phrase it as a scope question and ask, does Mr. Kaplan fall within the scope of the agreement? Does Mrs. Kaplan fall within the scope of the agreement? But that is not how the Supreme Court analyzed that question. Their rights as third-party beneficiaries would also be an FSIA question and a jurisdictional question. In fact, I'm quite sure that Nexterra is onto something by saying you should look at the original agreement, because Senator Lugar and Senator Mathias didn't say anything about offers and acceptance and treaties and investor-state arbitration in 1988. When they enacted the arbitration exception, they said, with or for the benefit. And it would be absolutely stunning and anomalous if that clause, with or for the benefit of a private party, could be invoked by somebody who is not the private party. Their rights as third-party beneficiaries would also be a jurisdictional question under the Foreign Sovereign Immunities Act. Make sure my colleagues don't have additional questions for you at this time. We'll give you a little bit of time for rebuttal. Mr. Shepherd. Morning, Your Honors. May it please the Court, Stephen Shepherd for the shareholders. This Court should affirm for three independent reasons I'd like to discuss. First, the Russian Federation has not carried its burden to refute the existence of an arbitration agreement. The District Court was correct on that point and should be affirmed. That agreement is contained in the ECT, and the Russian Federation agreed to apply it. The second reason to affirm, the Russian Federation should be precluded from relitigating the question of whether there is the existence of an arbitration agreement. The elements of issue preclusion are all met. I'll address there the one argument we heard on the one element, which is contrary to black-letter restatement law. And the third reason, Your Honor, the District Court correctly held that Russian Federation's arguments below were not jurisdictional in the first place, because those arguments did not challenge the existence of the arbitration agreement. That was the District Court's first reason before even turning to say, well, if these are under the FSIA, then I will therefore delegate, I will defer to the arbitrator's decisions as to the scope, non-existential, non-questions that do not go to existence. The next error decision makes clear that it's only the existence of the arbitration agreement and that the ECT itself contains an agreement to arbitrate. Mr. Shepard, why isn't it an error of law to defer, to give binding deference to an arbitral tribunal over a jurisdictional fact? How is that consistent with our general principles that Article III courts have an independent obligation to determine their jurisdiction? The ultimate question of whether sovereign immunity exists, of course, is for the District Court, but whereas here there is an element, a jurisdictional fact to be found, and where the agreement from, and where the, another court, the Dutch courts in particular have already found that, issue preclusion would be appropriate. As for, I'm not talking about the arbitral tribunal, which is the reasoning for the District Court's opinion. Yes, Your Honor. As to the existence of an arbitration agreement, this court has held in Chevron and Stillex that that issue is to be determined de novo by the District Court. And so how can it be a de novo determination to defer to an arbitral tribunal? The District Court, the District Court correctly determined that the Russian Federation had not carried its burden. The District Court was... Because it deferred to the arbitral panel. Part of the District Court's reasoning was based on believing that it was bound by the... So what's the best legal justification for deferring to an arbitral panel on a jurisdictional fact? The best argument, Your Honor, here is that here, unlike in Chevron and Stillex, the Russian Federation made a separate agreement in its July 29, 2005 letter, relied on by the District Court, in which the Russian Federation stated that it had reached the determination for the arbitrators to determine their own jurisdiction. The argument we hear from the Russian Federation is that that letter didn't go far enough, that there needed to be the additional sentence that says... And furthermore, we say that this delegation of power to the arbitrators is exclusive and that no one else shall determine. So the Russian Federation says, because that sentence was not in the letter, therefore the letter doesn't constitute a separate agreement by us to delegate this power to the arbitrators. On that argument, Your Honor, they're wrong as a matter of United States law. All of the cases that they cite and point to are from other jurisdictions. No United States court that they have cited has looked at an agreement, including the UNSATRA rules that give this power to the arbitrators, and certainly including something like the July 2005 letter. No U.S. court has looked at that and said, this is insufficiently clear. This initial delegation doesn't go far enough. It needs to say that it's exclusive. In fact, Your Honor, U.S. courts have said exactly the opposite. In a question involving subject matter jurisdiction? Because they've come up in Chevron and the other cases, they come up on arbitrability. They don't come up on the threshold question of jurisdiction. So it's about arbitrability, not about jurisdiction. Do you have any cases where that is the case about subject matter jurisdiction? No, Your Honor. So then, arguably, that's an issue of first impression. And so I'm not hearing an argument, a legal argument, about why that is an appropriate legal determination. The argument is that the delegation here was so clear to the arbitrators to make this decision. No, but you're not answering my question. My question is, why is it appropriate for an Article III court to defer to the arbitral tribunal on a jurisdictional fact? Because the sovereign made the threshold agreement to have the arbitrators to sign that decision, Your Honor, to make that decision. But even turning past the district court's reliance on the findings of the arbitral tribunal, the first point that I really want to make is the Russian Federation has not carried its burden. And a remand, this two weeks from today— Carried its burden as to what? As to refute the existence of the arbitration agreement. Under the burden-shifting framework this court has repeatedly applied, shareholders met their initial burden by producing the ECT, the notices, and the awards. The burden shifts to the Russian Federation. They have not carried that burden. Here's why, Your Honor. The ECT became binding on the Russian Federation when it signed the treaty. That's what Article 45.1 says. Each signatory agrees to apply the treaty provisionally to the extent not inconsistent with its constitution, statutes, and regulations. No ratification was required under Article 45.1. Russian law is the same in the federal law on international treaties. To the extent not inconsistent with Russian constitution, statutes, or regulations. There's nothing in the Russian constitution that's inconsistent with provisional application. We put excerpts of the Russian constitution in the record. The other side hasn't pointed to anything. Same with regulations. And as for statutes, well, there is a Russian statute that talks about provisional application. It's the federal law on international treaties. It's in the addendum at pages 129 through 130. And in Article 23.1, it says, yes, the Russian Federation may provisionally apply treaties. And that article has no reservations or exceptions whatsoever for any kind of provisional treaty. The history, as we've shown in the expert report cited, is that the Russian Federation has provisionally applied hundreds of treaties, including the 1990 Maritime Agreement that sets the border in the Bering Strait. Who has the authority to make the decision to provisionally apply a treaty? The same statute answers that question as well in Article 23.2, which states that whenever the Russian government, the executive branch, is the body that has taken the decision to apply a treaty, then it also may make the decision as to provisional application. That's precisely what happened here. Pages 209 through 211 of the appendix are the official documents from the Russian government deciding to sign the ECT and authorizing Deputy Chairman Davidoff to do it. And don't just take my word for all this, Your Honor. The Russian Federation, on three separate occasions, assured the world, the other signatories to the Energy Charter Treaty, that it was, in fact, provisionally applying. That's at pages 267, 271, and 274 of the appendix. Clear statements from the Russian Federation assuring everyone that it was provisionally applying the treaty from the date of signature, again, without any reservation or exception. Mr. Shepherd, assume that we agree with your colleagues on the other side, that the District Court does have to determine subject matter jurisdiction de novo. Can you talk about issue preclusion in the Dutch courts? How should the court think about whether there is issue preclusion? Yes, thank you, Your Honor. Issue preclusion, all of the elements of issue preclusion are met here. At the outset, we are not saying, no one is saying that the ultimate issue of sovereign immunity was decided by the Dutch courts. All we are saying is one element of the FSIA, the existence of the arbitration agreement, whatever that means, whatever argument the Russian Federation has, was previously made to the Dutch courts. The elements are met. The issues are the same. The Dutch courts' review was de novo, granting no deference to the arbitrators. That's at page 229 of the appendix. And the Dutch courts clearly had jurisdiction to make these decisions because the Russian Federation chose the Dutch courts for that purpose. It was the Russian Federation that elected to have these arbitrations held in The Hague, which made the Dutch courts the primary jurisdiction. After the arbitrations were done, it was the Russian Federation that went to those courts and asked them to decide this question. I mean, the issue preclusion questions here are not entirely the same as issue preclusion for domestic courts, right? We're thinking about principles of comedy and reciprocity. Here we have the unusual situation where we have a foreign court, but we also have a foreign sovereign that is the defendant. Are you aware of any cases that deal with how a court should think about those issues? In our surreply, Your Honor, we cite two district court decisions that have applied issue preclusion and claim preclusion in Foreign Sovereign Immunities Act cases. Involving a foreign judgment and a foreign defendant. Those were both domestic U.S. judgments. Well, that's not what I'm asking. So this is also then a question of first impression. It would. It is not a question. There are so many principles of black letter law that apply here, but putting them all together to say foreign sovereign and combines all of them together. Because that's why the FSIA kicks in. Your Honor, FSIA subject matter jurisdictions can be subject to res judicata. Otherwise, there would be endless 60B attacks for a lack of jurisdiction seeking to relitigate. At some level, that's true. But on the applicability of issue preclusion in the context of this case, at least raises some interesting questions that haven't been completely vetted by any court. There are some questions like that. Yes, Your Honor. Do we know, do you know, has the United States taken a position on the application of issue preclusion in this kind of setting? I'm not aware that it has taken a position one way or another. Staying on issue preclusion. Mr. Riesenberg attempted to challenge the elements of issue preclusion on one point. The point he was making was that the Dutch decisions as to the existence of the arbitration agreement are, in his view, insufficiently final and preclusive. Mr. Riesenberg is distorting what the law is. Section 487 of the restatement, restatement fourth of foreign relations law, states that a foreign judgment won't be given greater preclusive effect in the United States than the judgment would be accorded in the state of origin. The test under 487 is, have the foreign courts finally decided this? Is the question done? Does it have preclusive effect in the foreign courts? And here we have the answer. In the March 2024 decision of the Dutch Supreme Court, in the course of parallel enforcement proceedings by the shareholders, the Dutch Supreme Court held that the earlier decision as to the existence of the arbitration agreement is final. In fact, that court called it irreversible. That's at page 477 of the joint addendum. So that opinion, which the district court did not have the benefit of, is from the Dutch Supreme Court, and it answers the question. This is a final preclusive decision by the Dutch courts that an agreement to arbitrate exists. And for just that reason, these arbitral awards are being enforced in the Netherlands. The only other argument the Russian Federation has made about the elements of issue preclusion, the only one is a claim made below that there was fraud during the Dutch proceedings. Just to set how this came about, the district court accepted supplemental briefs after the Dutch opinions. In our June 2022 brief, we raised issue preclusion. In response, at ECF 246-1, the Russian Federation made one argument. It said you can't give issue preclusive effect because there was fraud on the Dutch courts. But the Russian Federation cited no evidence. The sole citation was to seven paragraphs in a reply brief they had filed in the Amsterdam Court of Appeal. And now, the Amsterdam Court of Appeal has answered the question in February of 2024. And this decision was one that the district court did not have the benefit of when it decided not to address the issue of issue preclusion. Maybe the district court then should have the benefit of it and address issue preclusion in the first instance. That's a possible route. It certainly is a possible route, Your Honor. I'd like to note that two weeks from today will mark the 20th anniversary of the beginning of these arbitrations. November 2nd, 2004 was the date on which my clients delivered to President Putin the formal notification of their claims. In the 20 years since then, first, the unanimous arbitral tribunal, including Judge Stephen Schwebel, appointed by the Russian Federation, agreed there was an agreement to arbitrate. And now the Dutch courts have finally decided the same. So we respectfully ask that this court affirm this threshold FSIA issue because an agreement to arbitrate existed, and then remand, not for further FSIA proceedings, but for finally addressing the Article V issues and for confirmation of these awards. Make sure my colleagues don't have additional questions for you. Thank you, counsel. Thank you. Mr. Riesenberg, we'll give you three minutes for your rebuttal. Thank you, Your Honors. Um, my friend on the other side has congratulated us on the 20th anniversary of this dispute between the Russian mafia and the Russian government. The current delay with respect to this appeal was not caused by the Russian Federation. There are lawyers, incredible lawyers, working on the other side who have written whole books about competence, competence. And if they wanted to make this U.S. litigation go faster, they should have consulted those lawyers who know exactly what competence, competence means. And they never would have raised this argument about exclusive delegation, which is what has caused the present delay. We are down a cul-de-sac arguing about whether this competence, competence clause means exclusive delegation to the arbitrators or merely allowing the arbitrators to finish their work without judicial interference. They always knew the answer, or at least their French lawyers always knew the answer, and their Dutch lawyers always knew the answer. And if they didn't want to delay this U.S. litigation, they could have dropped that argument. So the delay is not any reason to break from regular order and send down complicated questions of foreign law and treaty interpretation for the district court to have, as you said, Chief Judge Srinivasan, the first shot at those complicated questions. Second, my friend on the other side said that there is black-letter restatement law about issue preclusion in this circumstance. It is true that the restatement has proposed that issue preclusion could apply under the New York Convention, but the restatement does not talk at all in that section of its analysis about the immunity question, which Judge Rao was pointing to. There is no discussion in the restatement whatsoever about whether an American court should be bound by a foreign court with respect to a third state's foreign sovereign immunity. That's not even discussed in the restatement. And in any event, the restatement section that he is citing from the Restatement on International Arbitration fails to deal with the Second Circuit. And again, the Second Circuit has explicitly said in Sarhank and in VRG that when we're asking whether parties agreed to arbitrate, we do not defer to the Egyptian courts or the Brazilian courts. And that would apply here. We would not defer to the Dutch courts unless there's a decision granting annulment, which is an entirely different situation that we don't have here. My friend on the other side also said that Russian law supports his argument. He cited to the 1995 Federal Law on International Treaties. Once again, the district court did not analyze that Russian statute or discuss what it might mean. There is a provision on provisional application. There is also a provision under Article 15 of that same Russian statute which says that any treaty that departs from background Russian law, Russian statutory law, and then I could just finish my answer, Chief Justice Srinivasan. Any such treaty needs to be ratified. Petitioners, Hulley is making the point that supposedly the executive branch of the Russian Federation can supercharge its executive power by changing the label on a treaty. If the Russian government, and I'm not talking about the president, I'm talking about a lower level of the executive, basically the administrative branch of the Russian government. If they sign a treaty into force, it can't violate a statute. But if they change the label and say this treaty isn't enforced by virtue of my signature, this is a provisionally applicable treaty, suddenly they can violate a statute that was signed by the Russian parliament and signed by the Russian president. That would be a highly anomalous and absurd interpretation of the Russian legal system. The district court here should have the chance to hear those arguments in full. What role does Article, I think it's 45-2 play? Because there, under the ECT, Russia could have explicitly said we're not going to provisionally apply this treaty, right? Judge Wilkins, you're right. There is a provision, there's a separate approach where if a country doesn't want to involve the complex conflict analysis that Article 45-1 requires, they can just simplify their lives by issuing a declaration which says as a political matter, we don't want anybody ever to analyze whether the Energy Charter Treaty's individual provisions violate individual provisions of our laws. We would like to avoid that headache. I now, of course, wish that the Russian Federation had issued such a declaration, but that's an entirely separate mechanism. And none of the instances of the proceedings in the Netherlands, not the tribunal, not the first instance court, not the second instance court or the third instance court, have ever said issuing such a declaration was necessary to rely upon the limitation clause of Article 45-1, which is automatic, which requires no declaration. It's a self-executing limitation on which provisions of the Energy Charter Treaty apply to a signatory or not during the time period before graduating to the level of contracting party, which is the level where Spain and Luxembourg and the Netherlands position themselves within the ECT structure. Thank you, counsel. Thank you to both counsel. We'll take this case up for questions.
judges: Srinivasan; Wilkins; Rao